Argued and submitted August 27, voters' pamphlet explanatory statement certified as revised August 30, 1984

TELEDYNE INDUSTRIES, INC.,
dba Teledyne Wah Chang Albany,
*Petitioner,*

*v.*

PAULUS,
*Respondent,*

*and*

MARBET,
*Intervenor.*

(SC S31027)

687 P2d 1077

Richard H. Williams, of Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, argued the cause and filed the petition for petitioner.

Linda DeVries, Assistant Attorney General, Salem, argued the cause for respondent. With her on the amended answer to the petition were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Lloyd K. Marbet, intervenor pro se, argued the cause and filed memoranda.

## PER CURIAM

Petitioner Teledyne Wah Chang Albany (TWCA) brings an original proceeding in this court pursuant to ORS 251.235 to challenge the explanation of a ballot measure prepared by a citizens' committee for use by the Secretary of State in the voters' pamphlet. TWCA suggests a modification of the explanation. *See* ORS 251.185; ORS 251.205.[1] The Secretary of State, named as respondent, appears and is represented by the Attorney General.[2] She takes no position

---

[1] ORS 251.185 provides:

"The Secretary of State shall have printed in the voters' pamphlet for a general or special election a copy of the title and text of each state measure to be submitted to the people at the election for which the pamphlet was prepared. Each measure shall be printed in the pamphlet with the number, ballot title and the financial estimate under ORS 250.125, if any, to be printed on the official ballot, and with the explanatory statement and arguments filed relating to it. The Secretary of State also shall have printed in the voters' pamphlet any county measure, and ballot title, explanatory statement and arguments relating to it, filed by the county under ORS 251.285."

ORS 251.205 provides:

"(1) Not later than the 120th day before a special election held on the date of a primary election or any general election at which a state measure is to be submitted to the people, a committee of five citizens shall be selected for each measure to prepare the explanatory statement under ORS 251.215. The proponents of the measure shall appoint two members to the committee and notify the Secretary of State of the selections. The Secretary of State shall appoint two members of the committee from among the opponents, if any, of the measure. Those four shall select the fifth member and notify the Secretary of State of the selection. If the four members have not selected the fifth member by the 110th day before the election, the fifth member shall be appointed by the Secretary of State. A vacancy shall be filled by the person who made the original appointment.

"(2) As used in this section, 'proponents' means:

"(a) With respect to any state measure initiated or referred by petition, the chief petitioners; or

"(b) With respect to a measure referred by the Legislative Assembly, a Senator appointed by the President of the Senate and a Representative appointed by the Speaker of the House."

[2] ORS 180.060(1) provides:

"The Attorney General shall:

"(a) Appear for the state in the trial of all civil and criminal causes in the Supreme Court or the Court of Appeals in which the state may be directly or indirectly interested.

"(b) Appear for the state, when required by the Governor or the legislature, in any court or tribunal in any cause in which the state is a party or in which the state is directly interested.

as to the proposed modification. Intervenor Marbet opposes the proposed modification of the explanatory statement.

Before discussing the merits we address two preliminary questions pertaining to review of a petition challenging the explanatory statement prepared by the citizens' committee and filed with the Secretary of State.

The preliminary questions concern the presence of an adversary party in review of voters' pamphlet statements under ORS 251.235, because this affects whether that statute imposes on this court a function outside the "judicial power" to decide justiciable controversies. Or Const Art VII (am), § 1; *Oregon Medical Association v. Rawls,* 281 Or 293, 574 P2d 1103 (1978).

ORS 251.235 provides:

"Any person dissatisfied with an explanatory statement for which suggestions were offered at the Secretary of State's hearing under ORS 251.215, may petition the Supreme Court seeking a different statement and stating the reasons the statement filed with the court is insufficient or unclear. If the petition is filed not later than the fifth day after the deadline for filing a revised statement with the Secretary of State, the court shall review the statement, hear arguments and certify an explanatory statement to the Secretary of State. The review by the Supreme Court shall be conducted expeditiously to insure the orderly and timely conduct of the election at which the measure is to be submitted to the electors. The statement certified by the court shall be the explanatory statement printed in the voters' pamphlet."

This statute does not say with whom such a dissatisfied person has a dispute, *i.e.,* who is the party expected to respond to the petitioner's criticism of the statement prepared for the voters' pamphlet.

■ We agree with the parties that the Secretary of State is a proper party respondent. As "chief election officer" the

---

"(c) Appear, commence, prosecute or defend for the state all causes or proceedings in the Supreme Court or the Court of Appeals in which the state is a party or interested.

"(d) Appear, commence, prosecute or defend any action, suit, matter, cause or proceeding in any court when requested by any state officer, board or commission when, in his discretion, the same may be necessary or advisable to protect the interests of the state."

Secretary of State is responsible for "uniformity in the application, operation and Interpretation of the election laws." ORS 246.110. She is the official to whom this court is directed to certify an explanatory statement. ORS 251.235.

The statutes do not say that the Secretary of State is obliged to defend the voters' pamphlet explanation prepared by the citizens' committee.[3]

ORS 251.215 provides:

"(1) Not later than the 100th day before a special election held on the date of a primary election or any general election at which any state measure is to be submitted to the people, the committee appointed under ORS 251.205 shall prepare and file with the Secretary of State, an impartial, simple and understandable statement explaining the measure and its effect. The statement shall not exceed 500 words.

"(2) Not sooner than the 100th nor later than the 95th day before the election, the Secretary of State shall hold a hearing in Salem upon reasonable state-wide notice to receive suggested changes to any explanatory statement. At the hearing any person may submit suggested changes orally or in writing. Written suggestions also may be submitted at any time before the hearing.

"(3) The committee for each measure shall consider suggestions submitted under subsection (2) of this section, and may file a revised statement with the Secretary of State not later than the 90th day before the election. The original statement and any revised statement must be approved by at least three members of the committee. If a member does not concur, the statement shall show only that the member dissents."

This statute does not require the Secretary of State to defend a voters' pamphlet explanation prepared by a citizens' committee.

---

[3] The election laws grant the Secretary of State the authority to reject a voters' pamphlet statement that contains obscene, profane, scandalous or defamatory language, ORS 251.055(1)(a); incites or promotes hatred, abuse, ridicule or shame on any person or group by reason of race, color, religion, or manner of worship, ORS 251.055(1)(b); or contains language which may not be legally circulated through the mail, ORS 251.055(1)(c). These statutes authorize the Secretary of State to address the content of the committee's statement in these situations, but the policies served by these statutes are not implicated in this case.

TWCA did not name the committee as a respondent. TWCA petitioned this court for an order certifying a proposed amended explanatory statement of Measure No. 9, to be printed in the voters' pamphlet for the November 6, 1984, general election. TWCA named the Secretary of State as respondent, but following the language of ORS 251.235 did not request her to do anything. TWCA merely requested this court to modify and then certify the voters' pamphlet explanation.

The dissemination of the voters' pamphlet is an official function of the State of Oregon. Even though the pamphlet contains many statements prepared by persons who are not officials speaking for the state, someone must be in a position to respond to a challenge, such as that provided by ORS 251.235, that the laws and legal standards for the voters' pamphlet have not been followed.

■   Ordinarily, we expect the official for a governmental function that is challenged in court to appear either to defend the action taken or to state that the challenge is well taken in whole or in part. The Secretary of State is an elected constitutional officer, and she may determine what position, if any, she chooses to take in litigation involving one of her functions. For petitioners, it would be the better practice in the future to name the committee as a party respondent, so that it may respond. Again, we do not find that the committee is legally obliged to do so. But the fact that the committee, as well as the Secretary of State, properly can appear to contest the criticisms and proposed changes of the petitioner under ORS 251.235 is sufficient to provide the adversary character of the proceeding that makes the issues justiciable.

■   To sum up this issue, the Secretary of State is a proper party to be named in a petition to challenge a voters' pamphlet explanation. Her duties are primarily ministerial and she may remain neutral by taking no position on the merits of the challenge to the explanation. However, she may assume an adversarial role if she feels the explanatory statement warrants her to do so under ORS 246.110 or mandated by ORS 251.055(1). Justiciability does not depend on the fortuitous appearance of an intervenor. If TWCA made a claim in this court for modification of the explanation and Marbet had not intervened or the Secretary of State did not

appear, we would still have the duty specified by statute to certify a proper explanatory statement to be printed in the voters' pamphlet and not blindly certify TWCA's request. Many justiciable controversies go by default or without opposition. That does not mean the plaintiff in a civil case always receives the prayer of the complaint. Instead, the case is submitted to the court without benefit of the defendant's appearance or opposition, yet the court enters judgment only for the proper award. So it is here. TWCA presents a petition for certification of certain words to be contained in a voters' pamphlet explanation, and this court decides whether the explanation is insufficient or unclear. The appearance by the intervenor adds to the controversy, but is not indispensable to it.

Turning to the merits of this case, TWCA contends that the explanation prepared by the citizens' committee for the voters' pamphlet is insufficient and unclear. The explanation provides:

### "*Explanation*

"This measure amends an existing statute and adds findings the Energy Facility Siting Council must make before approving a site for the disposal of uranium mine overburden, radioactive waste, radioactively contaminated containers and receptacles and uranium mill tailings, wastes or by-products. 'Radioactive waste' includes all material, unless specifically exempted by law, that is discarded, unwanted or has no present lawful economic use, and contains:

"(1)  Mined or refined naturally occurring isotopes;

"(2)  Accelerator produced isotopes and by-products material;

"(3)  Uranium;

"(4)  Thorium;

"(5)  Plutonium;

"(6)  Uranium 233;

"(7)  Uranium enriched in isotope 233 or 235; and

"(8)  Any material artifically enriched by plutonium, uranium 233 or uranium enriched in isotope 233 or 235.

"Currently state law allows only for the disposal of:

"(a)  Uranium mine overburden or uranium mill tailings;

"(b)   mill wastes or mill by-product;

"(c)   radioactively contaminated containers or receptacles used in the transportation, storage, use or application of radioactive material; and

"(d)   wastes generated before June 1, 1981, through industrial or manufacturing processes which contain only naturally occurring radioactive isotopes.

"Before approving a site, the council would have to find that the site is not in or next to:

"(1)   An area subject to river, creek or ocean erosion;

"(2)   The 500-year flood plain of a river;

"(3)   An active fault or active fault zone;

"(4)   An area of ancient, recent or active mass movement including land sliding, flow or creep; or

"(5)   An area that has experienced volcanic activity within the last two million years.

"A council regulation presently requires before approving a site that it find that the facility can be designed to prevent dispersal of the waste due to a 500-year flood, as estimated and mapped by the U.S. Army Corps of Engineers, and the wind and water erosion to be reasonably expected at the site.

"The council would also have to find that:

"(1)   There is no available disposal technology and available alternative site for disposal that would better protect the health, safety and welfare of the public and the environment; and

"(2)   After the disposal site is closed, the waste will not release any radioactive material or radiation.

"These requirements would be in addition to current requirements."

■        TWCA makes two arguments. First, that the explanation sets out the broad statutory definition of "radioactive waste" found in ORS 469.375, which includes many kinds of prohibited waste, rather than using the narrower definition set out in ORS 469.525. Second, the explanation does not state the findings the Energy Facility Siting Council is currently required to make.

Regarding TWCA's first contention, we agree that the explanation is insufficient and unclear. ORS 469.375 sets out the findings required to be made by the Energy Facility

Siting Council before the council issues a site certificate to any radioactive waste disposal facility. ORS 469.525 narrows the scope of ORS 469.375 by providing that only certain types of waste disposal facilities can be established. The first paragraph of the explanation lists many kinds of radioactive waste. The explanation is not limited to those kinds of radioactive waste which can be disposed of in Oregon. We find the explanation insufficient and unclear and rewrite the explanation to reflect the limitation:

### *Explanation*

This measure amends an existing statute and adds findings the Energy Facility Siting Council must make before approving a site for the disposal of 'radioactive waste.'

Currently state law allows only for the disposal of:

(a)  Uranium mine overburden or uranium mill tailings;

(b)  mill wastes or mill by-product;

(c)  radioactively contaminated containers or receptacles used in the transportation, storage, use or application of radioactive material; and

(d)  wastes generated before June 1, 1981, through industrial or manufacturing processes which contain only naturally occurring radioactive isotopes.

Before approving a site for the disposal of wastes generated through industrial or manufacturing processes which contain only naturally occurring radioactive isotopes, the council would have to find that the site is not in or next to:

(1)  An area subject to river, creek or ocean erosion;

(2)  The 500-year flood plain of a river;

(3)  An active fault or active fault zone;

(4)  An area of ancient, recent or active mass movement including land sliding, flow or creep; or

(5)  An area that has experienced volcanic activity within the last two million years.

A council regulation presently requires before approving a site that it find that the facility can be designed to prevent dispersal of the waste due to a 500-year flood, as estimated and mapped by the U.S. Army Corps of Engineers, and the wind and water erosion to be reasonably expected at the site.

The council would also have to find that:

(1)   There is no available disposal technology and available alternative site for disposal that would better protect the health, safety and welfare of the public and the environment; and

(2)   After the disposal site is closed, the waste will not release any radioactive material or radiation.

These requirements would be in addition to current requirements.

We disagree with TWCA's second argument that the explanation is insufficient and unclear because it does not list the findings the Energy Facility Siting Council is currently required to make. The explanation states that pursuant to a council regulation, the council presently is required to make findings as to flood plains and wind and water erosion. We find this portion of the explanation to be sufficient and clear.

We certify the revised voters' pamphlet explanatory statement.